STATE BANK OF LA CROSSE, Appellant, vs. MICHEL, Respondent.

*January 7—January 28, 1913.*

*Statutes: Construction: Negotiable Instrument Law: Bills and notes: Collaterals applied to other purposes: Discharge of surety: Appeal: Mandate: Correction of clerical error below.*

1. In the construction of statutes words are not necessarily to be given their natural and exact meaning: if that would lead to injustice or absurdity a colloquial and inexact meaning may be preferred.

2. It is proper in such a case to consider also the defects or failings in the existing law which the statute was expected to correct, and the general object which the lawmakers had in mind.

3. The purpose of the Negotiable Instrument Law was not to make radical changes in established general principles, but to wipe out differences in minor details in the laws of the various states by adopting in each case of difference that uniform rule which was best adapted to the needs of the business world.

4. Under sub. 4a, sec. 1679—1, Stats. (providing that a person secondarily liable on a negotiable instrument is discharged "by giving up or applying to other purposes collateral security applicable to the debt, or, there being in the holder's hands or within his control the means of complete or partial satisfaction, the same are applied to other purposes"), if the creditor gives up or applies to other purposes collateral security to an amount less than the debt, the surety is not discharged of his entire liability, but *pro tanto* only.

5. The mandate in this case directing judgment for the plaintiff is amended so as to give opportunity in the court below for correction of a suggested clerical error as to the amount of collateral funds diverted by the plaintiff to purposes other than payment of the note upon which defendant was surety.

BARNES, J., dissents.

APPEAL from a judgment of the circuit court for La Crosse county: E. C. HIGBEE, Circuit Judge. *Reversed.*

For the appellant there was a brief by *W. S. Burroughs* and *Frank Winter,* and oral argument by *Mr. Winter.*

For the respondent there was a brief by *Woodward & Lees,* and oral argument by *G. M. Woodward.*

WINSLOW, C. J. This is an action brought against the surety upon a promissory note of $2,500. The defense was that the plaintiff had in its hands collateral security turned out by the principal to secure the payment of the note and applied said security to the payment of the principal's debt to another bank, and that by this act the surety was wholly discharged under the provisions of the Negotiable Instrument Law (sub. 4a, sec. 1679—1, Stats.). The trial court found that the plaintiff bank applied the sum of $1,331 of funds received by it from the sale of goods pledged to it by the principal debtor, as collateral for the note in suit, to the payment of the principal debtor's note to the Security Savings Bank, which note the plaintiff was under no legal obligation to pay. As a conclusion of law the court found that the defendant was entirely released from his liability as surety under the section of the Negotiable Instrument Law before cited, and dismissed the complaint.

The appellant contends that the defense found to exist by the court was not sufficiently pleaded, and that the evidence was insufficient to support the findings of the trial court. We do not deem it necessary to treat these contentions. We find no merit in them, and therefore overrule them without discussion.

. The difficult question presented by the case is a legal one, namely, Under the Negotiable Instrument Law (sub. 4a, sec. 1679—1, Stats.), is the surety discharged of his entire liability when the creditor gives up or releases collateral security to an amount less than the debt? In other words, does the release of collateral securities release the surety pro. tanto only?

In the present case the note which the defendant signed as surety was for $2,500. The collateral applied to the discharge of another debt by the creditor amounted to $1,331. Was the surety discharged in full, or was he only discharged to the amount of the collateral which the creditor diverted to another use?

The circuit judge held that the surety was wholly discharged, basing his conclusion upon the wording of the section of the Negotiable Instrument Law last cited. That section declares that:

"A person secondarily liable on the instrument is discharged: . . .

"(4a) By giving up or applying to other purposes collateral security applicable to the debt, or, there being in the holder's hands or within his control the means of complete or partial satisfaction, the same are applied to other purposes."

There is no question but that the construction given to this section by the trial court is a natural construction, and if it be the only construction of which the words are reasonably susceptible the court must adopt it. But is it the only construction which can reasonably be given to the words? We think not. So far as the surrendered security goes, the surety *is* discharged. In ordinary speech and writing an elliptical phrase of this kind is very common.

True, the expression is not strictly accurate in a case of this kind, but we believe that it is not infrequently used. Suppose in the present case that a person familiar with the facts had said to the responsible officer of the plaintiff bank at the time of the release of the $1,331 of collateral, "By that act you have released the surety." It would certainly have been very natural for the officer to ask at once, "Do you mean released entirely or only released *pro tanto?*" Now, if the words were only capable of one meaning, such a reply would neither be natural nor supposable.

While one would hardly expect colloquial or inexact expressions in a statute, it is unquestionably true that statutes do sometimes contain such expressions, and the question is whether that is not the case here. The idea that a surety for a thousand dollars indebtedness is to be wholly released because the creditor gives up five dollars' worth of collateral shocks the sense of fairness and justice. If there be another

construction which may rightly be placed on the language which will obviate such a palpably unjust result that construction should be used.

In considering whether the words used in the section should have their exact and precise meaning or whether they should be given their colloquial and inexact meaning, it is not only proper to consider the fact, if it be a fact, that the exact meaning would lead to unjust if not absurd results, but also to consider the defects or failings in the existing law which the act was expected to correct and the general object which the lawmakers had in mind.

It is very well known that the Negotiable Instrument Law was the result of a widespread conviction that it would be a great benefit to the American business world if the laws governing negotiable instruments could be made uniform throughout the country, instead of being diverse in many particulars in nearly every state. The law was prepared with the hope that it might be adopted practically without change in all of the states.

The purpose of the law was, not to make radical changes in long established and fundamental principles, but to wipe out the many differences in minor details existing between the laws of the various states by adopting in each case of difference that uniform rule which was best adapted to the needs of the business world. The idea was to secure uniformity by wiping out small differences, not to change the general principles of commercial law.

When, in 1899, the law was presented to the legislature of Wisconsin, it was accompanied with exhaustive notes to many of the sections, giving not only the Wisconsin authorities which support or bear upon the principle stated in the section, but also references to the decisions of other states and to the American and English Encyclopedia. These notes bear evidence of careful preparation by a good lawyer, and it is very suggestive to note that in cases where the rule in Wisconsin

was changed by the law, the annotation states the fact at the foot of the section and gives the authorities overruled by it. See secs. 1675—2, 1675—6, and 1676—28. It was evidently the purpose to call attention to any significant changes made by the bill in the Wisconsin law.

Sec. 1679—1, as it appeared in the original Negotiable Instrument Law which had been adopted in other states, provided that a person secondarily liable on a negotiable instrument should be discharged in six different ways, viz.:

"1. By any act which discharges the instrument;

"2. By the intentional cancellation of his signature by the holder;

"3. By the discharge of a prior party;

"4. By a valid tender of payment made by a prior party;

"5. By a release of the principal debtor, unless the holder's right of recourse against the party secondarily liable is expressly reserved;

"6. By an agreement binding upon the holder to extend the time of payment, or to postpone the holder's right to enforce the instrument, unless made with the assent, prior or subsequent, of the party secondarily liable, unless the right of recourse against such party is expressly reserved, or unless he is fully indemnified."

When, however, the bill was presented to the legislature of 1899, another subsection was added to the above list and named 4a, and that subsection was the one already quoted in this opinion providing for the discharge of the surety when the creditor gives up or applies to other purposes collateral securities pledged for the debt.    There was an excellent reason for adding this new subsection, for this court had laid down that principle in *Plankinton v. Gorman*, 93 Wis. 560, 67 N. W. 1128 (June, 1896), and it seems to be demonstrated that the new subsection was based upon this decision by the fact that the syllabus of the *Plankinton Case* is quoted in full in the note to the entire section under the heading "Releasing security."

It is equally clear that there was no intention to change the

law as laid down in *Plankinton v. Gorman,* but rather an intention to incorporate the principle of that case in the Negotiable Instrument Law, because no mention is made in the note of any change in the law of Wisconsin, and it is quite plain that the *Plankinton Case* is cited as the basis upon which sub. 4*a* rests.

Now *Plankinton v. Gorman* does not lay down the principle that a surety on a note is wholly discharged by the release of collateral securities by the creditor, however inconsiderable in amount. That was a case where the creditor had an interest in the assets of the principal debtor which, if enforced, would have satisfied his entire claim, and he voluntarily released the same, and it was held that he thereby released the indorser upon the note. Nothing was said in that case about the effect of a release of security insufficient in amount to pay the debt, because no such case was before the court. The rule was briefly stated that where a creditor has a lien upon the principal debtor's property *for the payment* of his debt and releases it voluntarily without attempt to obtain satisfaction of his debt, the surety is released. It was not necessary in that case to go further. But the idea that it was intended in that case to hold that the release of a few dollars' worth of collateral security would wholly discharge a surety upon a note for thousands of dollars is repelled by the authorities cited in support of the general doctrine. Examination of those authorities, and especially the case of *Rees v. Berrington* (2 Ves. Jr. 540) 3 White & Tudor, Lead. Cas. Eq. (Hare & Wallace's Notes) 529, shows that the principle upon which they rest is the principle of *pro tanto* discharge, and upon that alone. In the notes to the last cited case, at page 552, the doctrine is thus laid down with a wealth of authority:

"When the property of the principal has been attached or taken in execution by the creditor, . . . or when it has been voluntarily delivered to him as security for the debt, . . . the lien thus acquired cannot be relinquished without dis-

charging the surety *to an extent corresponding with its value.*"

This has unquestionably been the principle of the common law from the earliest times. It is also the rule of reason and justice. Must the court now hold that a harsh, drastic, and inequitable rule has been substituted for it by the Negotiable Instrument Law, when no intimation is given in the notes that the law has been so radically and unconscionably changed? We think not.

It is provided in the law itself, sec. 1684—6, that the notes may be resorted to for purposes of construction and interpretation. In our judgment the notes to this section point unmistakably to the conclusion that it was intended by sub. 4a to incorporate in the law the principle decided in *Plankinton v. Gorman,* and that principle was unquestionably the old equitable principle of discharge *pro tanto,* as is demonstrated by the authorities relied upon in the opinion.

Probably it did not occur to the person who drafted the subsection and inserted it in the section that any other construction could be given to it. We see now that there is another very natural construction which may be given to it, but as we are satisfied that it is susceptible at least of the limited construction which renders it equivalent to the long established and unbroken rule of courts of equity, we feel that it is our duty to give it that construction.

We have not so far in this discussion referred to the case of *Lowe v. Reddan,* 123 Wis. 90, 100 N. W. 1038, because the transactions in question in that case all took place before the passage of the Negotiable Instrument Law, and hence that law had no effect upon them and was not mentioned in the case. It appears by reference to the printed case that the note in that case was given May 18, 1896, was due August 18, 1896, and that the alleged release of security took place at or about the latter date.

But while the Negotiable Instrument Law was not involved

or discussed in that case, the general equitable principle was discussed, and a very large number of authorities are there cited, showing not only that the rule of *pro tanto* discharge in such a case as the present has been held by the authorities from time immemorial, but that the case of *Plankinton v. Gorman* plainly recognized that rule.

It follows that the plaintiff was entitled to judgment for the amount due upon the note after deducting the sum of $1,331, which is to be reckoned as a payment made upon the note as of the date of its diversion to other purposes, to wit, January 3, 1910.

*By the Court.*—Judgment reversed, and action remanded with directions to render judgment for the plaintiff in accordance with this opinion.

BARNES, J. (*dissenting*). The statute under consideration seems to me to be as plain as the English language can make it. It provides that a person secondarily liable on an instrument is discharged "By giving up or applying to other purposes collateral security applicable to the debt, or, there being in the holder's hands or within his control the means of complete or partial satisfaction, the same are applied to other purposes." Sec. 1679—1, sub. 4a. The statute provides for two contingencies. If the creditor applies collateral security to other purposes than the payment of the debt which it was given to secure, the surety is discharged. I do not see how this provision can be read to mean a partial discharge only, when the value of the collateral surrendered or misapplied is less than the debt which it was given to secure. If the legislature had so intended it would have said so. The second contingency provided for even more clearly, if possible, shows that the legislature intended what it said—a discharge— which obviously means nothing short of a complete discharge. This provision is to the effect that where there is in the creditor's hands or under his control the "means of complete or

*partial* satisfaction" and he fails to make the proper applica-
tion of them, the person secondarily liable is discharged.
The same result follows whether the property is partially or
entirely sufficient to pay the debt. In either case there is a
discharge. I think it is unfair to the legislature to say that
it had the intent found by the court. To do so is to convict
it of being extremely careless in the use of language in enact-
ing an important statute. At best we have another case of
"hindsight" being better than "foresight." If the matter
had been called to the attention of the legislature it might
have provided for *pro tanto* discharges only, in proper cases,
and then again it might not. It would not be difficult to ex-
press such an intention so that it could easily be understood.
Not having done so, one of two things is apparent: either the
legislature did not think of partial discharges, or else it did
not intend to provide for them. If the first "horn of the
dilemma" is correct the legislature should remedy the de-
fect, and if the second is correct there is nothing to remedy.

The following opinion was filed February 18, 1913:

PER CURIAM. In this case it has been informally sug-
gested, since the opinion was handed down, that the finding
of the circuit court to the effect that the amount of collateral
funds applied by the plaintiff bank to the payment of the
note held by the Security Savings Bank was $1,331 is a cler-
ical error and that the evidence in the record shows that the
payments so made aggregated $1,631. Reference to the
copy of the note in the record and the indorsements on the
back thereof seem to support this claim. However, the find-
ing of fact is unexcepted to and the appellant does not admit
the fact of error, hence we feel unwilling to correct the sup-
posed error, even conceding that we have power to do so, a
point which we do not decide. Inasmuch as the judgment is
reversed, it is entirely possible to give opportunity for the

correction of the error, if it be an error, in the trial court before final judgment is entered.    To accomplish this end the mandate is amended so that the same shall read as follows:

. Judgment reversed, and action remanded with directions to the trial court to take testimony, if necessary, to ascertain the correct amount of the payments made by the plaintiff on the note held by the Security Savings Bank, and, on ascertaining that fact, to render judgment for the plaintiff for the amount due on the note after deducting the amount so diverted as of the date January 3, 1910.